# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| PAUL F. WICKS and | ) | |
| ELENA A. WICKS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 16-CV-0638-CVE-FHM |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

This is an action for a tax refund. Plaintiffs Paul. F. Wicks and Elena A. Wicks and defendant United States of America on behalf of the Internal Revenue Service (IRS) dispute whether it was lawful for plaintiffs to claim losses from their cattle ranching activity on their 2010 and 2011 federal income tax returns. Before the Court is defendant's motion for summary judgment (Dkt. # 29), which presents two questions: in tax years 2010 and 2011, were plaintiffs, under the nine factor, objective test enumerated in Treas. Reg. § 1.183-2(b), engaged in their cattle ranching activity for profit? And, if not, are they liable for the accuracy-related penalty that the IRS imposed on them pursuant to 26 U.S.C. § 662? Also before the Court are plaintiffs' motion to strike evidence (Dkt. # 36) and defendant's motion to exclude the report and testimony of plaintiffs' expert (Dkt. # 45).

## I. Background

The following facts are undisputed: plaintiff Paul Wicks (Wicks) owns Wicks and Associates Industrial Services, LLC (Wicks and Associates), a highly profitable, twenty-year-old Tulsa company that provides mechanical inspection services for major oil refineries and gas plants. Dkt.

# 29-6, at 4, 49.[1] As the owner of Wicks and Associates, Wicks manages all of the company's supervisors and spends anywhere from ten to fifty hours a week doing so. Id. at 49-50. He has an associate's degree in applied science and has obtained several certifications from the American Petroleum Institute. Id. at 5. Wicks and Associates has anywhere from thirty to eighty employees, including an individual with an accounting degree who handles payroll, invoicing, deposits, and taxes. Id. at 50. The company maintains a corporate bank account and uses QuickBooks accounting software. Id. at 41, 68. According to Wicks, one of the reasons his company is so profitable is because his team operates "extremely efficiently." Id. at 51.

Since 2006, Wicks has reported $9,926,304 in adjusted gross income on his tax returns, an average of $992,630 per year. Dkt. # 29-2, at 30-191; Dkt. # 29-3, at 1-83.[2] In 2010 and 2011, Wicks's net worth was approximately $3,000,000. Id. at 85. Currently, Wicks has $2 to $3 million in savings and a net worth of approximately $7 million. Dkt. # 29-6, at 60-61.

In addition to his work at Wicks and Associates, Wicks built and maintains a cattle ranch—of which he is the sole owner and operator—in Nowata County, Oklahoma. Dkt. # 29-6, at 24. According to Wicks, he ventured into cattle ranching to "make a profit." Dkt. # 29-6, at 25. Every year since 1997 (when he began cattle ranching), however, he has claimed the following

---

[1]     Although Wicks's wife Elena is a co-plaintiff in this case, as the couple filed their 2010 and 2011 tax returns jointly, she was not involved in the cattle ranching activity at issue, and this opinion presents no occasion to refer to her. Accordingly, the Court will refer to Paul Wicks as "Wicks" herein.

[2]     Plaintiffs move to strike "all purported facts or evidence pertaining to tax year 2012 and any subsequent year, as such matters are not relevant to Plaintiffs' income tax deductions for tax years 2010 and 2011." Dkt. # 36, at 1. The Court decides this motion infra at Part III.A.i.

losses from cattle ranching as business deductions on his federal income tax returns, totaling

$807,380:

| | Gross Receipts | Expense | Net |
|------|------|------|------|
| 1997 | $ - | $ 10,459.00 | $ (10,459.00) |
| 1998 | $ - | $ 9,547.00 | $ (9,547.00) |
| 1999 | $ 637.00 | $ 25,027.00 | $ (24,390.00) |
| 2000 | $ - | $ 18,182.00 | $ (18,182.00) |
| 2001 | $ - | $ 31,028.00 | $ (31,028.00) |
| 2002 | $ - | $ 31,701.00 | $ (31,701.00) |
| 2003 | $ 159.00 | $ 41,806.00 | $ (41,647.00) |
| 2004 | $ 159.00 | $ 83,283.00 | $ (83,124.00) |
| 2005 | $ 2,026.00 | $ 37,751.00 | $ (35,725.00) |
| 2006 | $ 3,302.00 | $ 44,444.00 | $ (41,142.00) |
| 2007 | $ 7,659.00 | $ 23,800.00 | $ (16,141.00) |
| 2008 | $ 1,934.00 | $ 34,575.00 | $ (32,641.00) |
| 2009 | $ 155.00 | $ 42,954.00 | $ (42,799.00) |
| 2010 | $ 155.00 | $ 49,133.00 | $ (48,978.00) |
| 2011 | $ - | $ 103,706.00 | $ (103,706.00) |
| 2012 | $ 159.00 | $ 50,470.00 | $ (50,311.00) |
| 2013 | $ 16,257.00 | $ 61,576.00 | $ (45,319.00) |
| 2014 | $ - | $ 58,067.00 | $ (58,067.00) |
| 2015 | $ - | $ 82,473.00 | $ (82,473.00) |
| | $ 32,602.00 | $ 839,982.00 | $ (807,380.00) |

Dkt. # 29-2, at 30-191; Dkt. # 29-3, at 1-83; Dkt. # 29-4, 1-9; Dkt. # 29-6, at 57. Since 2006, Wicks

has presumably saved thousands of dollars of income tax by reporting his losses from cattle activity.

Dkt. # 29-5, at 8.[3]

---

[3]     The parties have not provided the amount that Wicks has saved in income tax by claiming his losses from cattle ranching. Defendant provides a declaration of an IRS revenue agent stating that Wicks has saved "a total of $332,452 in taxes by reporting his horse racing activity losses on Schedule C and cattle activity losses on Schedule F . . . ." Dkt. # 29-5, at 8. The Court, however, at plaintiffs' request, has dismissed their refund claim related to horse racing. Dkt. # 34. And the parties have not submitted a disaggregated figure reflecting only what Wicks saved in income tax by reporting his cattle activity.

In building and maintaining his cattle ranch, Wicks has not: written a business plan or financial projections (Dkt. # 29-3, at 188);[4] used QuickBooks or any other accounting software (id. at 190); created a separate bank account (Dkt. # 29-6, at 43); executed any written contracts (Dkt. # 29-3, at 190); formed a business entity (Dkt. # 29-6, at 44); marketed or promoted his cattle operation (id. at 68); insured his cattle against catastrophic loss (id. at 35-36);[5] or consulted a financial advisor (id. at 26). And before starting his ranch in 1997, Wicks's only experience with cattle was "feeding [and] working" them as a child. Id. at 25.

On the other hand, in building and maintaining his cattle ranch, Wicks has done the following:

- In 1997, purchased eighty acres of land with a dilapidated barn and unusable fence and repaired these features. Dkt. # 29-3, at 87;

- In 1998, purchased two longhorn heifers. Id.;

- In 2001, built a new barn. Id.;

- In 2002, bought an additional one hundred and eighty acres of land, adjacent to the original eighty acres, to increase his cattle herd and "the potential profitability from [his] cattle activities." Id. This land had nothing on it except an unusable fence and small pond. Id;

- From 2002 to 2006, improved the one hundred and eighty acres by: replacing the fence, enlarging the pond to hold more water, installing rural water so cattle could be watered during drought conditions and when the pond froze, building a "cattle working facility" (which immobilizes the cattle for purposes including vaccination) and

---

[4]     At his deposition, Wicks stated, "As far as the cattle business, I didn't track anything [in writing]. I would monitor it. I know about what I have in it. I can look at the amount of cows I have versus what the sales prices are, and I know kind of what's going on, yes. But as far as in writing, no, sir, I do not have that." Id. at 70.

[5]     In addition, on May 14, 2012, Wicks's insurance company issued a "risk alert" because he had "a lot more cattle than reported on the policy." Id. at 36.

"loafing shed" (to shelter the cattle) and consulting with a successful local rancher, Pat Faulkner, regarding profitable methods of cattle ranching. Id. at 87-88; Dkt # 35-1, at 1;

- In 2006, purchased twenty cows, ten of which were of the Simmental breed and ten of which were Charlois, to breed with his longhorn bull. Id. at 4-5. Based on advice from Faulkner and his own experience, Wicks sought to obtain cattle that were 1/2 Simmental, 1/4 Charolais, and 1/4 Longhorn because he believed this crossbreed would produce good milk and beef and possess characteristics that would allow them to thrive on his ranch. Id. at 7. Wicks was aware that obtaining such a crossbreed would take a minimum of four years. Id.;

- In 2010 and 2011, built four new loafing sheds (in response to several calves dying from pneumonia in 2009) and purchased hay bailing equipment and feed bins to reduce the cost of purchasing feed and bailing hay. Dkt. # 29-3, at 88-89;

- By 2012, amassed a total of 128 cattle. Dkt # 29-6, at 35;

- In 2013, sold eighteen cattle for $16,256.25. Dkt. # 29-3, at 88. Although Wicks's crossbred calves were "weaned and ready for sale" in the fall of 2011, cattle prices were depressed due to drought. Id. Accordingly, Wicks decided to increase his herd that and waited to sell until 2013, when cattle prices had rebounded. Id.;

- Over the years, attended seminars on topics including breeding and pasture management offered through Oklahoma State University at the Nowata County Extension office. Dkt. # 35-1, at 2-3. In addition, read "everything" on the Oklahoma State Extension office website about raising cattle and joined the Oklahoma Cattlemen's Association and the Texas and Southwest Cattlemen's Association. Id. at 10-11; and

- Maintained spreadsheets listing expenses he incurred from his cattle ranching activity. Dkt. # 35-8.

Additionally, Wicks has performed the labor required to build and maintain his ranch almost entirely on his own (with occasional help from a friend). Dkt. # 29-3, at 84. He spends, on average, three to four days per week at his ranch (Friday through Sunday and sometimes Wednesday). Dkt.

# 29-6, at 22. Wicks originally purchased the tracts of land for a total of $175,000 and, in 2014, his ranch was appraised at $725,000. Dkt. # 35-6. [6]

On or about October 27, 2014, upon denying plaintiffs' 2010 and 2011 business deductions for losses from their cattle ranching and horse racing activities, the IRS assessed against plaintiffs additional taxes in the amounts of $24,621 for 2010 and $44,214 for 2011. Dkt. #2-2. In addition, for those years, the IRS imposed accuracy-related penalties in the amounts of $4,924.20 and $8, 842.80 respectively. Id. Plaintiffs paid these amounts in full, plus interest. Id.

On August 29, 2015, however, plaintiffs filed a refund claim for these amounts with the IRS, but the agency has taken no action on this claim. Dkt. # 2. On October 13, 2016 plaintiffs filed this lawsuit, demanding, under 26 U.S.C. § 7422, a tax refund in the amount of $89,838.09 for the taxes and penalties the IRS assessed against them upon denying their 2010 and 2011 business deductions from their horse racing and cattle ranching activities. Dkt. # 2, at 3. At plaintiffs' request, the Court has dismissed their refund claim related to horse racing (Dkt. # 34).[7] But plaintiffs maintain that they are entitled to a refund for the taxes and penalties the IRS assessed against them for claiming losses from their cattle activity in 2010 and 2011, since, during these years, Wicks was engaged in cattle ranching "for profit," as that term is defined by Treas. Reg. § 1.183-2(b). Dkt. # 35, at 15.

---

[6]     In addition to these undisputed facts, Wicks made several additional averments in an affidavit (Dkt. #35-5) attached to his response to defendant's motion for summary judgment. Defendant, however, argues that the Court should exclude these averments from the summary judgment record because they are inconsistent with statements in Wicks's deposition and responses to interrogatories, and tailored to defeat defendant's motion for summary judgment. Dkt. # 39-1. The Court decides which, if any, of these averments it will consider on summary judgment infra at Part.III.A.ii.

[7]     As discussed above, see supra note 3, plaintiffs have not provided the Court with a revised statement of the amount they are now seeking as a refund for the 2010 and 2011 taxes and penalties related to the cattle ranching activity.

Defendant now moves for summary judgment on plaintiffs' remaining claim (Dkt. # 30).

## II. Standard of Review

Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Kendall v. Watkins, 998 F.2d 848, 850 (10th Cir. 1993). The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex, 477 U.S. at 317. "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" Id. at 327.

"When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." Anderson, 477 U.S. at 252. In essence, the inquiry for the Court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 250. In its review,

the Court construes the record in the light most favorable to the party opposing summary judgment. Garratt v. Walker, 164 F.3d 1249, 1251 (10th Cir. 1998).

### III. Evidentiary Issues

Before deciding defendant's motion for summary judgment, the Court must resolve three evidentiary issues: (1) plaintiffs' motion to strike evidence pertaining to tax year 2012 or any subsequent year (Dkt. # 36); (2) the question, raised by defendant in its response to plaintiffs' statement of additional material facts, Dkt. # 39-1, of whether the Court will consider on summary judgment any of the averments in Wicks's affidavit (which was submitted in response to defendant's motion for summary judgment); and (3) defendant's motion to exclude the report and testimony of plaintiffs' expert (Dkt. # 45).

### i. Plaintiffs' Motion to Strike

Plaintiff moves to strike "all purported facts or evidence pertaining to tax year 2012 and any subsequent year, as such matters are not relevant to Plaintiffs' income tax deductions for tax years 2010 and 2011." Dkt. # 36, at 1. But plaintiff neither offers a reason as to why such evidence is irrelevant nor presents any authority indicating that it is inappropriate for a court to consider evidence pertaining to subsequent tax years in an action for a tax refund. And defendant, by contrast, cites several cases from the United States Tax Court stating that "[e]vidence from years after the years in issue is relevant to the extent it creates inferences regarding the taxpayer's requisite profit objective in earlier years." Dkt. # 38, at 3 (quoting Dodds v. Comm'r, 105 T.C.M. (CCH) 1472, at *11 (2013)); see also Knudsen v. Comm'r, 94 T.C.M. (CCH) 461, at *9 (2007) (". . . profits or losses . . . in subsequent years have probative, although not determinative, significance in [determining the existence of a profit motive in the earlier years].") (quotation omitted).

Accordingly, the Court will consider as part of the summary judgment record evidence pertaining to tax year 2012 and any subsequent year, if such evidence creates an inference regarding Wicks's profit motive (or lack thereof) in cattle ranching in 2010 and 2011 and is otherwise admissible under the Federal Rules of Evidence. Plaintiff's motion to strike (Dkt. # 36) is therefore **denied**.

### ii. Wicks's Affidavit

In response to defendant's motion for summary judgment, plaintiffs submitted an affidavit containing factual averments that Wicks had not made in any prior filings or testimony. Dkt. # 35-5. This affidavit is substantially similar to the narrative statement Wicks provided in his response to defendant's interrogatories, except that it contains several statements that Wicks did not express in his narrative response to defendant's interrogatories or at his deposition. Compare id., with Dkt. # 29-3, at 87-89; Dkt. # 29-6.  In its response to plaintiffs' statement of additional material facts, defendant argues that the Court should exclude the new averments in Wicks's affidavit because he cannot, at this late stage in the litigation, inject new factual assertions merely to defeat defendant's motion for summary judgment.

An affidavit may not be disregarded solely "because it conflicts with the affiant's prior sworn statements." Franks v. Nimmo, 796 F.2d 1230, 1237 (1986) (citations omitted). "In assessing a conflict under these circumstances, however, courts will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." Id. "Factors relevant to the existence of a sham fact issue include whether the affiant was cross-examined during his earlier testimony, whether the affiant had access to the pertinent evidence at the time of his earlier

testimony or whether the affidavit was based on newly discovered evidence, and whether the earlier testimony reflects confusion which the affidavit attempts to explain." Id.

Wicks was cross-examined at his deposition and none of the factual averments in his affidavit is based on newly discovered evidence. Dkt. # 29-3, at 87-89; Dkt. # 29-6. The Court, therefore, will exclude from the summary judgment record any assertions in Wicks's affidavit that contradict his prior statements, serve no clarifying purpose, and appear to have been tailored to defeat defendant's motion for summary judgment.

The material factual averments in Wicks's affidavit that defendant argues the Court should exclude from the summary judgment record, and the Court's findings as to whether it will exclude these statements, are as follows:[8]

> 1.   "In 1997, I bought 80 acres of land . . . for the purpose of going into the cattle business . . . ." Dkt. # 35-5, at 1. Defendant contends this contradicts Wicks's earlier statement, "I had the land and I bought some cattle to try to make money with the cattle market." Dkt. # 29-6, at 24. The Court will not consider Wicks's statement that he bought the eighty acres for the purpose of going into the cattle business because it contradicts his prior testimony, serves no clarifying function, and appears to be tailored to defeat defendant's motion for summary judgment.

> 2.   "After the purchase of land in 1997, I . . . began to educate myself through Oklahoma State University courses offered by the local extension office." Defendant contends this contradicts Wicks's earlier statement that his cattle education was limited to "seminars and clinics over the years . . . but none of these were for continuing education credits . . . ." Dkt. # 29-3, at 86. The Court will not consider Wicks's statement that he took Oklahoma State University "courses" because it is an unsupported, self-serving

_____

[8]   Defendant takes issue with numerous statements in Wicks's affidavit. Dkt. # 39-1. In the Court's judgment, some of these statements are immaterial, and the Court does not address them.

recharacterization of his earlier statement that he attended cattle ranching seminars and clinics.

3.    "Knowing that 80 acres was not sufficient to accommodate the size of the cattle operation that I wanted to develop, in 2002, I bought an additional 180 acres . . . ." Dkt. # 35-5, at 2. Defendant argues that the Court should not consider this statement because plaintiffs had not previously disclosed it. Dkt. # 39-1, at 4. The Court will, however, consider this statement; it is consistent with Wicks's prior statement that he purchased the 180 acres to "increase the potential profitability from [his] cattle activities." Dkt. # 29-3, at 87.

4.    "From 2003 to 2006 . . . [I built two barns] to store both hay and the [farm] equipment [...] To improve the pastures on the ranch, I also added clover to the mix." Dkt. # 35-5, at 2. Defendant argues that the Court should not consider these statements because plaintiffs had not previously disclosed them. Dkt. # 39-1, at 6. The court will consider Wicks's statement that he built a second barn because the record indicates that there are two barns on his ranch (Dkt. # 35-6, at 7-10). The Court will not, however, consider Wicks's statement that he added clover to improve his pastures because he did not make this statement in his responses to interrogatories or at his deposition and it appears to be tailored to defeat defendant's motion for summary judgment.

5.    "[Throughout 2009 and 2010] I . . . continued to upgrade the property so that now all 260 acres are a working modern ranch." Dkt # 35-5, at 3. Defendant asserts that Wicks's characterization of his property as a working modern ranch is an amendment to his prior statements and appears to be made to defeat defendant's motion for summary judgment. Dkt. # 39-1. The Court agrees and will not consider this statement as part of the summary judgment record.

6.    "At the time of purchasing the property, I expected land values to go up . . . ." Dkt. # 35-5, at 3. Defendant argues that this statement is an amendment to Wicks's prior statements and appears to be made to defeat defendant's motion for summary judgment. Dkt. # 39-1, at 8. The Court agrees and will not consider this statement as part of the summary judgment record.

7.    "[I]n 2009, [I] experienced a heart attack that required hospitalization and intensive treatment. My heart attack substantially affected my ability to work on the ranch in 2009, 2010, and 2011." Dkt. # 35-5. Defendant argues that the Court should not consider this statement

because it contradicts Wicks's prior testimony that he was back doing at least some work at his ranch within "about two weeks" of his heart attack and appears to be made to defeat defendant's motion for summary judgment. Dkt. # 29-6, at 60. The Court agrees and will not consider this statement as part of the summary judgment record.

8.    "My intention from the outset was to develop a ranch that I could ultimately retire to, and replace my income from Wicks and Associates . . . ." Dkt. # 35-5, at 4. Defendant argues that this statement is an amendment to Wicks's prior statements and appears to be made to defeat defendant's motion for summary judgment. Dkt. # 39-1, at 14. The Court agrees and will not consider this statement as part of the summary judgment record.

### iii. Defendant's Motion to Exclude Expert Report and Testimony

Plaintiffs' expert A.L. Hutson submitted a report and testimony. Hutson is a an agricultural economist retired from Oklahoma State University, with experience in marketing and risk management, financial management and planning, farm and ranch record keeping, crop and livestock development and use, and estate planning. Dkt. # 35-3, at 4. He has evaluated the feasibility of over 120 Chapter 12 reorganizations, provided agriculture training to Federal Reserve and state bank examiners, and has numerous publications on the topics of cattle management and the economics of cattle ranching. Id.

In his report, Hutson concludes, "I believe Mr. Wicks entered into the cattle business with a desire to make the operation profitable." Id. at 1. In justifying this conclusion, he states that: (1) Wicks's health issue in 2009, as well as drought in Oklahoma and a correspondingly depressed cattle market, were contributing factors in the unprofitability of Wicks's cattle ranch in 2010 and 2011; and (2) Wicks built and maintained the ranch by himself and demonstrated a willingness to adapt his method (for example, by cross-breeding his cattle). Id. at 3. Additionally, Hutson attached to his report a document he created entitled "Major Steps in Creating a Profitable Cattle Operation," and,

he concludes, Wicks has completed all of these steps. Id. at 10. In preparing his report, Hutson visited Wicks's ranch and interviewed him, reviewed Wicks's relevant tax information for the years 2006-2015, studied the spreadsheets Wicks maintained to track his cattle ranching expenses, and analyzed rainfall and cattle market prices in the Nowata County area for years in and around 2010-2011. Id. at 3. Additionally, Hutson avers that, after submitting his report, he reviewed numerous additional documents—including Treas. Reg. § 1.183-2(b) and Wicks's deposition–that, he states, confirmed his conclusion. Dkt. # 48-7.

Defendant has filed a motion challenging the reliability of the methodology Hutson used to reach his conclusion. Dkt. # 45. In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), the Supreme Court held that district courts must initially assess the admissibility of "scientific" expert testimony under Fed. R. Evid. 702. The Supreme Court extended the gatekeeper role of federal district courts to all expert testimony in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999). In Bitler v. A.O. Smith Corp., 400 F.3d 1227 (10th Cir. 2005), the Tenth Circuit discussed the role of district courts in considering a Daubert challenge to the admissibility of expert testimony. First, the court should make a preliminary finding that the expert is qualified to testify. Id. at 1232-33. Next, the proponent of expert testimony must establish that the expert used reliable methods to reach his/her conclusion and that the expert's opinion is based on a reliable factual basis. Id. at 1233. The Tenth Circuit cited four factors that district courts should apply to make a reliability determination:

> (1) whether a theory has been or can be tested or falsified; (2) whether the theory or technique has been subject to peer review and publication; (3) whether there are known or potential rates of error with regard to specific techniques; and (4) whether the theory or approach has "general acceptance."

Id. at 1233 (citing Daubert, 509 U.S. at 593-94). The Tenth Circuit was clear that "a trial court's focus generally should not be upon the precise conclusions reached by the expert, but on the methodology employed in reaching those conclusions." Id. In other cases, the Tenth Circuit has emphasized that any analytical gap in an expert's methodology can be a sufficient basis to exclude expert testimony under Daubert. Trucks Ins. Exchange v. MagneTek, Inc., 360 F.3d 1206, 1212-13 (10th Cir. 2004); Goebel v. Denver & Rio Grande Western R. Co., 346 F.3d 987, 992 (10th Cir. 2003). Under Daubert, "'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" Mitchell v. Gencorp Inc., 165 F.3d 778, 783 (10th Cir. 1999) (citing In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 745 (3d Cir. 1994)).

Defendant argues that Hutson's report and testimony should be excluded because, in drawing the conclusion that Wicks was engaged in cattle ranching for profit in 2010 and 2011, Hutson: (1) relied on discussions with Wicks and did not independently verify the information Wicks provided; (2) ignored portions of Wicks's deposition testimony that indicate Wicks' lacked a profit motive in cattle ranching; (3) predicated his analysis of the 2009-2013 cattle market on the average price of animals weighing between 450 and 550 pounds even though Wicks never demonstrated that he sold or intended to sell cattle within this weight range; and (4) ignored critical sources of information—including Treas. Reg. § 1.183-2(b)—in preparing his report and inappropriately used these sources of information to confirm his conclusion in hindsight. Dkt. # 46, at 13-23. Additionally, defendant argues that Hutson's testimony would be more prejudicial than probative and that, if the Court does allow him to testify, he should not be permitted to opine on matters that his report does not address, including and especially Treas. Reg. § 1.183-2(b). Dkt. # 46, at 23-25.

In response, plaintiff argues that: (1) it was methodologically sound for Hutson to rely on conversations with Wicks; (2) Hutson could not have reviewed the Wicks deposition before creating his report because he finalized it before the deposition transcript was available; (3) Hutson's analysis of the cattle market for animals weighing 450-550 pounds was intended to "verify the volatility and overall depressed cattle prices during the relevant time frame;" (4) defendant's argument that Hutson's report is more prejudicial than probative is conclusory; and (5) Hutson did review Treas. Reg. § 1.183-2(b) in preparing his report, and this is proven by the fact that the regulation is outlined in an academic article that Hutson cites as one of the bases for his report. Dkt. # 48, at 7-20.

The Court finds that Hutson is qualified as an expert agricultural economist (and defendant does not challenge this qualification). But Hutson is not an accountant. The Court, therefore, will allow as part of the summary judgment record only the portions of Hutson's report and testimony that relate to his expertise in agricultural economics, are relevant to whether Wicks engaged in cattle ranching in 2010 and 2011 with a profit motive within the meaning of Treas. Reg. § 1.183-2(b), and otherwise comport with Daubert. These portions are: (1) Hutson's explanation of drought conditions and the general state of the cattle market in and around Nowata County, Oklahoma, in 2010 and 2011; and (2) Hutson's opinion of what the necessary steps are to create a profitable cattle ranch and the ways in which Wicks did or did not comply with these steps. The Court will not, however, consider on summary judgment any other portions of Hutson's report and testimony, including and especially whether Hutson personally believed Wicks had a profit motive (because Hutson's personal belief is irrelevant) and whether Hutson believed Wicks had a profit motive within the meaning of Treas. Reg. § 1.183-2(b) (because "an expert may not state legal conclusions drawn by

applying the law to the facts . . . ." <u>United States v. Richter</u>, 796 F.3d 1173, 1195 (10th Cir. 2015) (quotation omitted)).

## IV. Defendant's Motion for Summary Judgment

Defendant argues that it is entitled to summary judgment on plaintiffs' claim because the evidence demonstrates beyond dispute that plaintiffs, under Treas. Reg. § 1.183-2(b), were not engaged in cattle ranching for profit in 2010 and 2011. Dkt. # 30, at 6-7. In response, plaintiffs argue that it is "uncontroverted" that Wicks was engaged in cattle ranching for profit within the meaning of Treas. Reg. § 1.183-2(b) in 2010 and 2011(though plaintiffs do not move for summary judgment). Dkt. # 35, at 24.

Not every expense associated with a business transaction is deductible. "For a deduction to be allowed it must be shown that the activity engaged in was operated with an actual and honest profit objective." <u>Hildebrand v. Comm'r</u>, 28 F.3d 1024, 1026-27 (10th Cir. 1994) (citing 26 U.S.C. § 183). The burden to prove the requisite profit objective is on the taxpayer. <u>Id.</u> at 1027.  In analyzing whether a taxpayer had a profit motive, Treas. Reg. § 1.183-2(b) sets forth nine, nonexclusive factors:

(1) the manner in which the taxpayer carries on the activity;
(2) the expertise of the taxpayer or his advisors;
(3) the time and effort expended by the taxpayer in carrying on the activity;
(4) expectation that assets used in activity may appreciate in value;
(5) the success of the taxpayer in carrying on other similar or dissimilar activities;
(6) the taxpayer's history of income or losses with respect to the activity;
(7) the amount of occasional profits, if any, which are earned;
(8) the financial status of the taxpayer; and
(9) elements of personal pleasure or recreation.

<u>Id.</u> Additionally, the regulation directs,

In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph . . . are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors . . . indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa.

Id.

Below, the Court determines whether the record in this case establishes, as a matter of law, that Wicks was not engaged in cattle ranching for profit within the meaning of Treas. Reg. § 1.183-2(b) in 2010 and 2011.

## A. Treas. Reg. § 1.183-2(b)

### i. The Manner in which Wicks Carried on his Cattle Ranching Activity

Defendant argues this factor is in its favor because Wicks under-insured his cattle and lacked financial projections, a separate bank account, a business entity, and a written business plan for his cattle operation. Dkt. # 30, at 25-27. This manner of operating stands in stark contrast, defendant asserts further, to the way in which Wicks ran Wicks and Associates. Id. at 27. Plaintiffs respond that Wicks's cattle ranching business practices—including limiting his record keeping to expense-tracking spreadsheets—were consistent with the practices of other, profitable cattle ranchers in the area and that his willingness to adopt new operating methods evinces a profit motive. Dkt. # 35, at 16-17.

Section 1.183-2(b)(1) provides that a profit motive may be indicated where a taxpayer maintains complete and accurate books, carries on an activity in a manner substantially similar to other, profitable activities of the same nature, or adopts new techniques. Certainly, the facts that Wicks under-insured his cattle and lacked financial projections, a separate bank account, a business entity, and a written business plan do not indicate that Wicks was engaged in cattle ranching to make

17

a profit. Neither does his admission at his deposition that he did not, in writing, "track anything" related to the profits and losses of his cattle operation. Dkt. # 29-6, at 70.

On the other hand, Wicks's accountant testified that most cattle-ranching clients he services do not have written business plans or income statements, and Hutson's report indicates that, in Hutson's opinion, Wicks has taken all the steps necessary to build a successful cattle-ranching business . Dkt. # 35-2, at 7; Dkt. # 48-1, at 10. Moreover, in utilizing a cross-breeding strategy based on advice from Pat Faulkner, and developing his ranch in response to his cattle's health concerns (by, for example, building loafing sheds and cattle working facilities), Wicks has demonstrated a willingness to change his operating methods and adopt new techniques in an effort to increase his cattle operation's potential profitability.

Ultimately, much of the case law interpreting § 1.183-2(b)(1) places heavy emphasis on whether the taxpayer carries on an activity in a "businesslike manner," <u>i.e.</u> uses "cost accounting techniques," has a business plan, business entity, or corporate bank account, or engages other such practices that allow the taxpayer "to make informed business transactions." <u>Keating v. Comm'r</u>, 94 T.C.M. (CCH) 383, at *4-6 (2007). The record indicates that Wicks, with respect to his cattle activity, failed to do any of these things; instead, he maintained simple spreadsheets to record his expenses, which, objectively speaking, appear to do little more than "memorialize for tax purposes the existence of the subject transactions." <u>Id.</u> at *5. Moreover, as defendants point out, Wicks is a successful businessman who employs a variety of sophisticated financial practices in running Wicks and Associates.

Accordingly, although there is some evidence that the manner in which Wicks operates his cattle ranch is consistent with other local ranchers, and he has demonstrated a willingness to adopt

new operating methods, the fact that he employed no sophisticated business practices and his records were so rudimentary suggests that this factor favors defendant.

## ii. The Expertise of the Taxpayer or his Advisors

This factor is in its favor, defendant argues, because before undertaking cattle ranching in 1997, Wicks's only experience with the activity was milking cows sporadically as a child and, since 1997, Wicks has done no more than informally consult with acquaintances on the topic. Dkt. # 30, at 29. Plaintiffs argue, to the contrary, that since 1997 Wicks has taken many steps to acquire expertise in cattle ranching, including: extensive self-study, attending numerous clinics and seminars, joining professional associations of cattleman, and consulting with a Nowata County field agent and Pat Faulkner, a successful local rancher. Dkt. # 35, at 17.

Section 1.183-2(b)(2) provides that extensive study of the accepted business, economic, and scientific practices of an activity, as well as consultation with experts, may indicate that the taxpayer has a profit motive. One court found this factor to be in the taxpayer's favor where he "acquired some expertise in cattle raising through self-education and . . . relied upon the expertise of others [with cattle-ranching experience] through regular consultation." Mullins v. United States, 334 F. Supp. 2d. 1042, 1053 (E.D. Tenn. 2004). Another court, however, has found this factor to weigh against the taxpayer where his experience with cattle was limited to when he was "growing up" and he consulted only with "acquaintances for informal advice." Embroidery Express, LLC v. Comm'r, 21 T.C.M. (CCH) 76, at *11 (2016).

The record demonstrates that Wicks engaged in self-education (through attending cattle ranching seminars and reading online materials) and received advice from a Nowata County field agent and Faulkner, who had been a successful rancher and advised Wicks to pursue a cross-

breeding strategy. Wicks did not, however, pursue any formal cattle ranching education or hire paid consultants or experts, and the regularity with which he consulted Faulkner is unclear. These facts indicate that Wicks neither zealously pursued nor neglected opportunities to gain expertise in cattle ranching. The record, therefore, suggests that this factor is neutral.

### iii. The Time and Effort Expended by the Taxpayer in Carrying on the Activity

Defendant contends this factor favors it because Wicks spends most of his week away from his ranch and does not employ anybody to assist him in operating the ranch. Dkt. # 30, at 31. This factor favors them, plaintiffs retort, because Wicks spends thirty percent of his time, and significant energy, performing hard labor on the ranch, including: clearing land; installing and repairing fences; improving the pond; constructing barns and loafing sheds; caring for and maintaining cattle; and storing equipment. Dkt. # 35, at 18. Plaintiff adds that these activities, for Wicks, have no recreational aspect.

Section 1.183-2(b)(3) provides that where a taxpayer devotes much of his personal time and effort to carry on an activity, especially where the activity does not have substantial personal or recreational aspects, a profit motive may be indicated. The record indicates that, since 1997, Wicks has devoted, on average, three days per week (and sometimes four) to maintaining and developing his cattle ranch. Three or four days per week cannot reasonably be considered an insubstantial amount of time. Moreover, the evidence reveals that Wicks devotes his time at the ranch to maintaining and developing it, which entails hard physical labor, and defendant points to no evidence demonstrating that this physical labor has substantial personal or recreational aspects for him. Accordingly, because Wicks spends a substantial amount of time at the ranch performing

arduous physical work, and because there is no evidence that he finds substantial recreation in this toil, the record suggests that this factor weighs in plaintiff's favor. [9]

### iv. Expectation that Assets Used in Activity May Appreciate in Value

Defendant argues that this factor weighs in its favor because Wicks's cattle are inventory (not assets he expected to hold and appreciate), his farm equipment has depreciated, and the Court should not consider any appreciation of his real property in its analysis because his purchase of the land and his cattle operation are separate activities. Dkt. # 30, at 34. Plaintiffs respond that this factor favors them because they have presented evidence that Wicks has grown his herd, his land has appreciated in market value and from the capital improvements he has made to it (and the Court should factor this into its analysis because his land ownership and cattle ranching are a single activity), and his accountant believes Wicks could "probably" recoup his losses from cattle ranching if he sold his property. Dkt. # 35, at 18-19.

Section 1.183-2(b)(4) provides that the term "profit" encompasses an appreciation of assets, including land, and, therefore, a profit motive may be indicated where a taxpayer loses money in performing a given activity but expected to compensate for this loss with the appreciation of the land or other assets used in the activity. The Court agrees with defendant that Wicks cannot reasonably be said to have had an expectation of appreciation with respect to his cattle (which he bred to be saleable inventory) or farm equipment (the depreciation of which he claimed as business losses).

---

[9]    As the Seventh Circuit has noted, "[c]ommon sense indicates . . . that rational people do not perform hard manual labor for no reason, and if the possibility that [the tax payer] performed these labors for pleasure is eliminated the only remaining motivation is profit." Nickerson v. C.I.R., 700 F.2d 402, 407 (7th. Cir. 1983).

Wicks's land, however, is a different story. To determine whether land ownership and an activity the taxpayer conducts on the land are a single activity, the Court must look to the "degree of organizational and economic interrelationship of" the land and that activity. 26 U.S.C. § 1.183-1(d)(1). The record indicates that in 2010 and 2011 there was a high degree of organizational and economic interrelationship between Wicks's land and his cattle ranching operation and, for the purposes of summary judgment, the Court treats the two as a single activity. Although the evidence suggests that Wicks might not have committed to developing a cattle ranch prior to purchasing his original eighty acres in 1997, the record reveals that he purchased his additional one hundred and eighty acres in 2002 for the purpose of growing his cattle operation, and, since then, has made substantial capital improvements to the land, all dedicated to expanding his ranch. And there is evidence that Wicks's effort have been fruitful—he acquired the properties for $175,000 and, in 2014, they were appraised at $725,000. The record, therefore, suggests that this factor favors plaintiffs because Wicks's could reasonably be said to have had an expectation of the "appreciation

of . . . the value of capital improvements [he] made on [his] land." <u>Welch v. Comm'r</u>, 114 T.C.M. (CCH) 578, at *12 (2017). [10]

### v. The Success of the Taxpayer in Carrying on Similar or Dissimilar Activities

Defendant argues that this factor favors it because the stark contrast between the ways in which Wicks runs Wicks and Associates and his cattle ranch indicate that Wicks does not operate the latter with a profit motive. Dkt. # 30, at 36-37. Plaintiffs retort that this factor weighs in their favor, as Wicks runs his cattle ranch with the same work ethic that he runs Wicks and Associates. Dkt. # 35, at 19-20.

Section 1.183-2(b)(5) provides that a profit motive may be indicated where an individual has engaged in similar or dissimilar activities in the past and turned them profitable even where the current endeavor is not profitable. The evidence demonstrates that Wicks does not operate his cattle ranch with nearly the type of sophistication that he employs in running Wicks and Associates. Wicks's cattle operation, in contrast to Wicks and Associates, does not have any employees (let

---

[10]    Defendant argues that, "to support a profit motive, Wicks must show that the expected appreciation [of his land] is sufficient to recoup the accumulated losses of prior years," and because he has claimed $807,380 in losses from cattle activity, and gained only $555,000 in his property value, an inference of profit motive is unsupportable with respect to his expectation of property appreciation. Dkt. # 30, at 35 (quoting <u>Foster v. Comm'r</u> 104 T.C.M. (CCH) 90, at *7 (2012)). But the record in this case indicates that, by 2011, Wicks had already made most if not all of the capital improvements that existed at the time of the 2014 audit, and, at that point, had reported only $571,210 in losses (making it a reasonable possibility that his gain in property appreciation from capital improvements was roughly equivalent, in 2010 and 2011, to the losses he had sustained from cattle ranching). Moreover, recent authority from the United States Tax Court, <u>contra</u> <u>Foster</u>, states that the "question is not whether [the taxpayer] would [through asset appreciation] recoup all of [his ranch's] losses but whether he would recoup the losses between the years in issue and the hoped-for profitable future." <u>Welch v. Comm'r</u>, 114 T.C.M. (CCH) 578, at *12 (2017). And the record reveals that in 2010 and 2011 Wicks made substantial capital improvements to his property, the appreciation of which he could have reasonably expected to offset the approximately $150,000 in total losses he claimed for those years.

alone an accountant), a separate bank account, a business entity, or a business plan. On the other hand, it is evident that Wicks expends a significant amount of time, energy, and money in maintaining and developing his ranch and, in light of his past success in running a highly profitable business, these facts might reasonably be said to lend an inference that he is engaged in cattle ranching for profit. See, e.g., Hoyle v. Comm'r, 68 T.C.M. (CCH) 1321, at *13 (1994) (factor weighed in taxpayer's favor where he was a successful attorney turned farmer who, in the past, had "demonstrated a willingness to take risks" and capacity for "nurturing a new endeavor"). Accordingly, the record suggests that this factor is neutral.

### vi. The Taxpayer's History of Income or Losses with Respect to the Activity

Defendant contends this factor weighs in its favor because Wicks has been involved in cattle ranching for approximately twenty years, never generated a profit, reported $807, 380 in losses, and 2010 and 2011 were more than ten years past the commencement of his cattle operation, making these years beyond what might reasonably be considered a startup phase. Dkt. # 30, at 38. Plaintiff does not dispute any of defendant's contentions but argues that the losses Wicks reported in 2010 and 2011 (and surrounding years) do not indicate a lack of profit motive because these losses were sustained as a result of his decision to start a multi-year, cross-breeding program in 2006, his heart attack in 2009, and drought and a correspondingly depressed cattle market from 2010-2012. Dkt. # 35, at 20-21.

Section 1.183-2(b)(6) provides that sustained losses may indicate that an activity is not being engaged in for profit. The impact of this factor against a taxpayer, however, may be mitigated where there are explanations for the losses, such as drought, depressed market conditions, or other circumstances beyond the taxpayer's control. The record is clear that in every year from 1997

24

through 2015, Wicks has reported substantial losses, and never any profits, from his cattle activity. The evidence, therefore, clearly suggests that this factor weighs in defendant's favor. The evidence also suggests, however, that the degree to which Wicks's losses indicate he lacked a profit motive in 2010 and 2011 are at least somewhat mitigated by his 2006 decision to adopt a multi-year cross-breeding strategy, his 2009 health concerns, and, as Hutson's report verifies, drought and a correspondingly depressed cattle market from 2010-2012.

### vii. The Amount of Occasional Profits, if any, Which are Earned

Defendant argues that this factor cuts in its favor because Wicks has never reported a profit from his cattle ranching activities. Dkt. # 30, at 38. Plaintiffs concede that this factor "may weigh in favor" of defendant. Dkt. # 35, at 21. Plaintiffs point out, however, that Courts have noted that "farming is not the most profitable business in which one can be engaged." Id. (quoting Faulconer v. Comm'r, 748 F.2d 890, 900 n.12 (4th Cir. 1984); see also Riker v. Comm'r, 6 B.T.A. 890, 893 (1927) ("If losses, or even repeated losses, were the only criterion by which farming is to be judged a business, then a large proportion of the farmers of the country would be outside the pale. It is the expectation of gain, and not gain itself which is one of the factors which enter into the determination of the question.")).

Section 1.183-2(b)(7) provides that the amount of profits in relation to the amount of losses incurred may provide useful criteria in determining the taxpayer's intent. The record clearly suggests that this factor weighs in defendant's favor. The case law, however, also suggests that the degree to which Wicks's failure to turn a profit as a cattle rancher suggests he lacked a profit motive should be at least somewhat mitigated by the fact that small farming operations are not generally speaking, lucrative businesses.

### viii. The Financial Status of the Taxpayer

Defendant argues that this factor favors it because Wicks generates substantial income from Wicks and Associates, which he uses to sustain his cattle operation. Dkt. # 30, at 40. Plaintiffs do not contest this. Plaintiffs argue, however, that this factor "merely makes the commonsense point that the expectation of [being] able to arrange to have the tax collector share in the cost of a hobby may often induce an investment in such a hobby which would not otherwise occur." Dkt. # 35, at 22 (quoting Engdahl v. Comm'r, 72 T.C. 659, 670 (1979)). And, plaintiffs argue further, this concern is not present here because Wicks was not engaged in cattle ranching as a hobby. Id.

Section 1.183-2(b)(8) provides that substantial income from sources other than the activity at issue may indicate that the activity is not engaged in for profit, especially where losses from the activity generate substantial tax benefits and there are personal or recreational elements involved. The evidence suggests that this factor weighs in defendant's favor because Wicks has substantial income from Wicks and Associates (which funds his cattle operation) and his losses from cattle ranching generate substantial tax benefits. Defendant has not, however, presented evidence demonstrating that, for Wicks, there are personal or recreational elements involved in cattle ranching. And this lack of evidence makes it less likely that Wicks is engaged in cattle ranching as a hobby, which, but for his ability to claim a portion of its costs as business deductions, he would not have taken up.

### ix. Elements of Personal Pleasure or Recreation

As defendant concedes, "courts have stated that raising cattle generally lacks significant recreational aspects." Dkt. # 30, at 41 (citing Gardner v. Comm'r, 108 T.C.M. (CCH) 71, at *23 (2014)). Defendant nevertheless argues that this factor weighs in its favor because Wicks maintains

a personal residence on his ranch and has admitted to enjoying the outdoors. Id. Plaintiffs respond that Wicks's ranching activity has no personal or recreational aspects, as his work on the ranch consists of bookkeeping, study, and arduous physical labor. Dkt. # 35, at 23.

Section 1.183-2(b)(9) provides that personal or recreational elements may indicate that an activity is not engaged in for profit and, conversely, a profit motivation may be indicated where an activity lacks any appeal other than profit. As established, defendant has presented no evidence that suggests Wicks engaged in cattle ranching for personal or recreational purposes.[11] And there exists in the case law a common sense presumption against finding cattle ranching, and the arduous labor it entails (which Wicks performs almost entirely on his own), to have significant recreational aspects. The record and the relevant case law, therefore, suggest that this factor weighs in plaintiffs' favor.

## B. Conclusion

In light of Treas. Reg. § 1.183-2(b)'s nine factors, and the totality of the circumstances in this case, the Court, viewing the evidence in the light most favorable to plaintiffs, finds that a reasonable jury could conclude that in 2010 and 2011 Wicks was engaged in cattle ranching for profit. First, Wicks has consistently maintained that this is so. More significantly, the expert report and testimony of A.L. Hutson suggests that Wicks has completed the steps necessary to build a profitable cattle ranching business (despite his lack of sophisticated business practices and record-keeping methods). In addition, the evidence reveals that Wicks attempted to gain expertise in cattle ranching through self-study, seminar attendance, and consultation with a local expert (Pat Faulkner), that he was willing to adopt at least one major new technique (i.e. a cross-breeding program) in

---

[11]     See supra Parts IV.A.iv, viii.

pursuit of greater profitability, and that he has expended very substantial amounts of time, energy, and money in turning what was essentially empty land into a two hundred and sixty acre ranch with one hundred and twenty cows and multiple facilities that, in 2014, was valued at close to three-quarters of a million dollars. Finally, defendant has presented no evidence indicating that cattle ranching had significant personal or recreational aspects for Wicks.

Accordingly, a reasonable jury could find that in 2010 and 2011 Wicks was engaged in cattle ranching for profit within the meaning of Treas. Reg. § 1.183-2(b). Defendant's motion for summary judgment (Dkt. # 29), therefore, must be **denied** as to this issue.[12]

## C. Accuracy-Related Penalty Under 26 U.S.C. § 662

Defendant argues that plaintiffs are liable for the accuracy-related penalty that the IRS assessed against them for reporting their cattle ranching losses as business deductions in 2010 and 2011. Dkt. # 30, at 42-44. Plaintiffs dispute this. Dkt. # 35, at 23. Because the Court has denied defendant's motion for summary judgment, and the question of whether it was lawful for plaintiffs

---

[12]     For examples of cases where courts have found that the taxpayer was not engaged in cattle ranching for profit see Gardner v. Comm'r, 108 T.C.M. (CCH) 71 (2014) (cattle rancher not engaged in activity for profit where he financed cattle with promissory notes that he failed to pay, violated his cattle lease agreement, did not maintain even a list of expenses, failed to produce evidence that he studied cattle or spent time on his ranch, and reported substantial increases in losses from cattle activity in the same years that he reported substantial increases in profits from his insurance business); Stonecipher v. Comm'r, 80 T.C.M. (CCH) 854 (2000) (cattle rancher not engaged in activity for profit where taxpayer spent limited time working with cattle, despite living full time on the ranch, and admitted that he doubted his cattle activity would ever become profitable). By contrast, for a case with somewhat similar facts to this case where the court found that the taxpayer was engaged in cattle ranching for profit, see Welch v. Comm'r, 114 T.C.M. (CCH) 578 (2017) (cattle rancher found to be engaged in activity for profit—even where he was independently wealthy, personally financed his cattle operation, and sustained significant losses and made no profits over an eleven year period—where he kept records to determine income and expenses, maintained a separate bank account, made multiple changes to his operating methods, and employed experts to assist him in carrying out his ranching activity).

to report their losses from cattle activity remains unresolved, the Court reserves judgment on this questions. Defendant's motion for summary judgment (Dkt. # 29) is **denied** as to this issue.

**IT IS THEREFORE ORDERED** that plaintiffs' motion to strike evidence (Dkt. # 36) is **denied**, and defendant's motion to exclude the report and testimony of A.L. Hutson (Dkt. # 45) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment (Dkt. # 29) is **denied**.

**IT IS FURTHER ORDERED** that plaintiffs will provide to the Court a notice, reflecting the fact that they are now seeking a refund only for the taxes and penalties the IRS assessed against them in 2010 and 2011 relating to the business deductions they claimed from cattle activity, and the total amount claimed for such refund, no later than **January 29, 2018**.

**DATED** this 22nd day of January, 2018.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE